Good morning. May it please the Court. Sharon Nelson on behalf of Anthony Didiana. I had the pleasure of arguing last week in Las Vegas in front of a couple of you, so I'm certain you're hoping for some change next argument around. Perhaps we can make arrangements for you to appear in the courthouse the next time you argue. I would love a trip to San Francisco. That would be delightful. These are random draws, and you randomly are twice before school. Well, I feel honored to be here. If I could reserve three minutes for rebuttal, I would appreciate that. Look the clock, and I will also try to help you as well. Thank you. I appreciate that. We're here on appeal because the district court made an initial determination from surveillance videotapes that were submitted in support of the appellee's motion for summary judgment, in which the appellee characterized on the surveillance videotapes that our client misappropriated funds. Our contention is the videotapes do not show that, and in fact the videotape creates an issue of fact that should have precluded dispositive relief in this case. Operating on that assumption and moving on from that assumption, the district court then found that we failed to establish a prima facie case with respect to the gender discrimination claim. Would you start there with the video? What is it in your view that creates an issue of fact from that video footage? There's two things. First of all, the respondent argued that the video affirmatively showed that our client was engaging in wrongdoing, and it does not do that. What the video does show is security personnel on behalf of the respondent reciting what they believe the videotape demonstrates, but the videotape itself does not show wrongdoing. Did your client admit to exercising bad judgment? He actually did not, Your Honor. What the record shows is that he admitted to, I could have made a mistake. If I made a mistake, I apologize, and that's on the record at 0104. But he did not specifically say that he had either engaged in the conduct or exercised bad judgment. He did, however, say that he could have made a mistake, and if he did so, he apologized. Does the court exercise independent judgment with regard to what the video shows? Wouldn't it be enough if the company's concluded for its purposes the video showed misconduct or dishonesty or taking company funds? Couldn't the company act on that without discriminating? No, and in fact, there's two ways to answer that question. First of all, the court can't make a determination from viewing the videotape what the videotape shows. I'm not sure why the court matters, whether the court can make the determination. If the company has made the determination and that's the basis for the company's action, what gives the court the right to second-guess what the video shows? The problem with this particular case is that there's evidence in the record showing that there were upper levels of management, specifically those that oversaw Mr. Didiana, that targeted him for termination, and that's what calls into question the reliability of the videotape evidence. Well, but the videotape evidence is what it is. The targeting of Mr. Didiana, let's split this up between gender and age discrimination. Is there any evidence that upper management or any kind of management was looking at Mr. Didiana on a gender base? No. The evidence with respect to the gender-based claim relates to whether people who were similarly situated were treated differently than Mr. Didiana. The age discrimination portion of the claim is where the evidence came into play that shows that upper management offered a $400 bonus for termination of older bartenders, that Mr. Didiana was mentioned by name by upper-level management as someone who was targeted for termination. So if you split those up and we leave aside the memo, which is a troubling memo to see in any company's records, but we go first to the gender discrimination, and on that there's no evidence that they were affirmatively trying to target him, correct? Not with respect to gender. To gender, okay. So the evidence with respect to gender is your suggestion that he was treated different than female cocktail servers, is that right? That is correct. And going back to the question why do we have to take into account the videotape, why do we have to question whether the court properly relied on that videotape, I don't think you can separate the two claims to do that. The reason we're arguing the videotape is, in fact, potentially pretext, is because of all those statements that were previously made targeting our client, indicating they wanted him out of his position, offering bonuses to get rid of older bartenders. And when you take all of that into account and the employer rests solely on the videotape for purposes of termination and the videotape doesn't show any wrongdoing. Well, he says he may have made a mistake, but then you have Micheline, Joanna, Tony, and there may be others, females, who were basically there was evidence of wrongdoing and they were either fired or disciplined, correct? Yes and no. They were eventually fired or eventually disciplined, but most of them were given multiple opportunities to address the similar mistake. And, in fact, we have affidavits from one of the cocktail servers that indicated that she made that mistake on numerous occasions while working at the pool or in the showroom where she forgot to ring up drinks and management said don't worry about it, just be more careful in the future. We have evidence from Mr. Marone, who was the acting beverage manager, beverage director at the time, indicating that he investigated five similarly situated employees for the same type of wrongdoing of which our client was accused. And those employees, although he recommended that further action be taken against them, HR made a determination not to proceed with any further action. One of those employees in particular, Ms. O'Brien, was found voiding out drinks and improperly failing to ring in drinks, which is some of the exact same behavior that our client was taken to task for. Well, if we assume, which I think you have, that cocktail servers and bartenders are roughly in the same category for purposes of not giving out free drinks to friends or failing to ring up drinks at the casino, what do you do with, and you can move through the whole prima facie part of the employment discrimination test, what do you do with the Ninth Circuit case of Snead, which basically says even if you have one other similarly situated employee, that that negates or erases pretext. Would you address that point? Yes, and that is a correct interpretation of the Snead case, but that's not what happened in this particular situation. We presented evidence at the lower district court level that there was not one similarly situated employee that was treated identical to our client. Instead, for example, when an employee was caught with improper cash handling or failing to ring in drinks as our client was, one of those employees was investigated for a period of eight months and not terminated until much later for a different infraction. Another employee was given approximately eight days to correct the cash handling error that she had made and then was only terminated once there was an altercation where she pushed a co-worker and that co-worker was pushed into a patron, and that is what she was terminated for. And as you go through the evidence of those who were identified as similarly situated, none of them were terminated with respect to the exact reason that our client was terminated for in the exact manner. In essence. What implications do we take from the different position, that is, the difference between cocktail servers and bartenders in terms of what their responsibility is for ringing up drinks and how they do it? I understand the cocktail servers purchase the drinks and then resell them, whereas the bartenders are sort of handling the house's money directly. So what do we draw from that? The district court found that those employees were not similarly situated and said essentially that bartenders handled the money and cocktail servers served the drinks. And he relied primarily, the district court did, on the position statement submitted by the employer in support of that finding. That's not actually true based on what the evidence was that was presented at the lower court level. The cocktail waitresses, depending on where they were stationed, did ring in drinks and did handle money, whether it was through credit card transactions or cash handling transactions. So really the only difference in the two positions was that the bartenders were back behind the bar mixing the drinks. On rare occasions there was some testimony that cocktail servers were allowed to pour the drinks, but that was discouraged and didn't happen very often. But other than that, the responsibilities were nearly identical. And that was service of the drinks, whether the customer was sitting at the bar or somewhere else where the cocktail server had to deliver the drinks, accepting payment or arranging for payment for the drinks, making sure that proper change was provided to the customer and making sure there was proper- Do O'Shea's have any female bartenders? Not that we were able to uncover during the course of this particular lawsuit. I can't flat out say that they don't have them. We just weren't able to find any during the course of this lawsuit. So I think that with respect to the district court's finding that our client did not perform to the legitimate expectations of the employer, if this court looks at the videotape and deduces, as we did, that there's no way to ascertain if he engaged in wrongdoing, that in and of itself creates a question of fact with respect to that issue. Remembering that the district court level did not discuss the fact that the burden of proof for the Prima Fasci case is minimal. It's not even rising to a level of preponderance, and yet found that there was not an establishment of both the second and the fourth requirement for that Prima Fasci case. Dealing with the similarly situated employees was the second reason why the court set aside the gender discrimination claim and said there was not Prima Fasci evidence that was established. Well, that's why I asked you to skip through that, in effect, give him all- credit him to his benefit. You go through the Prima Fasci. You assume they're the same job category. You get to the end of the road under McDonnell, Douglas or Burdine, but then you come back to pretext and sneed. So if there is, then you could, you have to kind of split your analysis, either they're similarly situated or not. If there are no similarly situated people, then he would lose. But let's assume the cocktail servers are similar. If there's one example, then the pretext is met, correct? That is correct. Okay. And there was not one example. And you just think the examples don't correlate correctly. They don't, and that was detailed at the lower court level, and it was also detailed in the opening briefs. And once we get to pretext under Smith, we can show that the more favorable treatment of similarly situated employees establishes pretext. So for that reason, we think the gender discrimination claim was improperly subjected to dispositive relief. And for some of the reasons that we've already discussed, the age discrimination claim was as well. We understand that there was a but-for requirement. We understand that the gross case requires that of us. I think that case is very appropriately named if you're a plaintiff's attorney. But nonetheless, that requirement was met in this particular case by the direct evidence that we did find of management making the statements they did, offering bonuses that they did, and specifically mentioning our client by name as someone who was being targeted for termination. The only reason the court decided against the age discrimination claim was, again, in 100% reliance on the surveillance video. And that takes us back to our original argument that that particular decision by the district court was improper and an error. So for those reasons, we would ask that the lower court's decision be overturned. I see I'm going to be running into my rebuttal time, unless I have further questions. We'll save the rest for rebuttal. Thank you very much. Okay. Good morning. May it please the court. I'm here today representing Parbol Corporation in regards to the claim brought by Mr. DeDiana. And I think the important fact that we have here is that Mr. DeDiana has never denied the conduct that Parbol found on that videotape. We've got a situation where Parbol chose to bar, Bugsy's Bar chose to have a video camera over the bar area. For whatever reason, it didn't have the same video surveillance of the same people in other parts of the premises. But the important fact is, similarly situated, okay? You start with that proposition. The cocktail waitresses or the cocktail servers and the bartenders are not similarly situated. The bartender has access to the cash register. The bartender has to audit the daily receipts. The bartender has to report on those items. They're two different situations. Was there any misconduct found on the part of the plaintiff with regard to any of the different responsibilities assigned to a bartender? As far as the other responsibilities other than the determination basis, which was a misappropriation of the funds, is that the question? Giving away free drinks.  That was alleged against several of the cocktail servers as well. That is the same type of conduct that could be alleged. The difference is, I think, Your Honor, is that they've got to, at the end of the day, account for what they've done. The bartender's there with ready access to the cash register. The cocktail waitress has to ring in to the POS or point of sale system what the drinks are. And, yes, they do collect funds from the customers. But even if you go past that and say, and assume for purposes of this that these people are similar situated, there's no dispute that every single time someone has been caught on video surveillance, they've been terminated. Micheline was the individual, although for different circumstances, when it was determined it was on video surveillance, she was terminated. Ned was a bartender. When it was determined that Ned had engaged in similar conduct, he was terminated. And it's rife throughout the testimony of everyone who provided testimony is that the video surveillance, that was an absolute. In other cases, they would give the benefit of the doubt to the employee. And in this case, they gave the benefit of the doubt. But it's on video surveillance. He's caught red-handed. And when they talk about, well, he must have made a mistake, there are actually three different sets. There's the August 27th, which is when he's shown on videotape. When they found that evidence, they went back and looked on August 25th to see if there's pulled other videotape. Found similar conduct on August 25th. Then you have the videotape of the interview, where he's interviewed by my client's investigator from the Human Resources Department. And there, the only place he testifies that he may have made a mistake was in regards to improperly bringing in vodka drinks, because he thought he had a credit card from somebody else. And if you go through that, he never once denies what's there. They then give him the benefit of the doubt, and they go back, and they look at that specific videotape to determine if maybe somebody did give a credit card, if he may have been correct. They don't find that information. That's when they terminate him a few days later. He then files his grievance, because he's a union steward. He goes through that process. But then in terms of rather than go through the arbitration proceeding with the union, he withdraws that and voluntarily resigns. And then we have this lawsuit today. One of the underlying claims he makes is that the whole video system is discriminatory, because if it only videos, as a matter of course, bartenders as opposed to cocktail servers, that right there you have a gender-based approach. What is the company's response to that? The company's response is it doesn't – I mean, a cocktail server could be male or female. Bartender could be male or female. It's the area that they choose to do it. Are there any? Are there any? Male bartenders. Male bartenders. Female bartenders. Or male cocktail servers. I am not aware of any male cocktail servers. I don't know. It wasn't a fact in the record below. Do we know of any female bartenders? I don't know that for certain either. I don't think that was a fact that was produced in the record below. But I think the fact of the matter is is that the employer has made a decision, a personnel decision, on what areas it's going to videotape. It decides it's going to videotape the bar area. Whether that's a wise decision or an unwise decision, whether they should have more comprehensive videotape or not, incur the cost of that. How did one of the cocktail waitresses or cocktail servers get ensnared? Because there is video footage. Is it Micheline? Micheline. Who was videotaped wrongdoing and then terminated. Is that right? Yes. Okay. Is she just a collateral videotape? There are areas where the videotape will see it. One of the issues appears to be that when it comes to improperly ringing in items, which was not the basis for which Micheline was terminated as a result of the video, it's more difficult to see what the cocktail waitresses may or may not be doing. That's why they go back and they review each of those. Whenever there's a complaint, the employer goes back and reviews each and every one of those to determine, do we have solid proof? It sounds like solid proof. The quality of the evidence is the distinction you're drawing with regard to this individual and others who were not terminated. Does that open the door to the question posed by plaintiff's counsel, which is that what is the quality of the evidence? She contends that the videotape is not so clear in demonstrating dishonesty on his part. Is the court supposed to be in the business of evaluating the evidence in that fashion? No, I don't believe so, Your Honor. But if you draw the distinction saying good evidence, solid evidence against him, not against others, well, doesn't that invite the court to decide was that solid evidence? Well, but I think in that instance, Your Honor, I think what has to happen is the employer looks at that evidence. The employer makes a determination. They don't have to give the benefit of the doubt to anyone. They choose to give the benefit of the doubt to everyone, regardless, Mr. Didion or anyone. Suppose they chose to give the benefit of the doubt to young female employees and not give the benefit of the doubt to older male employees. Can they do that? No. They can't do that. So here's the quandary we're in, because we don't have, I mean we have a limited number of people in each of the boxes. The only person we have with regard to his category, we don't know about any female bartenders, we don't have anybody who's been caught on video doing what he was alleged to have done, and yet you're drawing the distinction based on solid evidence. I'm kind of stuck with the proposition. Well, it's suggested that the solid evidence is really a pretext. There's no solid evidence there at all. Does that invite the court to second-guess the video, take a look at the video and second-guess the judgment of the company? No, I don't believe so, Your Honor, because I think you also have, although he's another male bartender, when it's on video and clearly shows what's there, they've terminated him. No one here has disputed, in fact, even the former employees that they produced affidavits or testimony from, none of them ever disputed that if there is clear evidence on video, the person is terminated. That's been ironclad throughout. What about the second chance? In other words, some of these employees, and I recognize some of the evidence may be hearsay, but some of the employees seem to get a longer leash to have another chance if they were caught, or there was suspicion that they had mismanaged the point of sale and putting in the money. And so they had a long investigation, they got to keep working, or they got another chance before then it was the final ax fell. Would that not also be a differential treatment if there's a difference between, say, immediate termination and what I'll call the second chance opportunity? I don't know that those are necessarily second chance, Your Honor. What they are is a situation where the employer investigates, looks to determine what the basis is. In fact, in the cases where they found that there was insufficient evidence to do anything because they didn't have clear evidence of what happened, those would even be removed from the personnel file. So you have a situation where it's not necessarily a second chance. We're going to do a term of investigation. We're going to see if we can come up with concrete evidence. If they have concrete evidence, they act on it. If they don't have concrete evidence, it doesn't mean we have no concrete evidence. Today, someone reports a violation by an employee of something to do with their personnel file, in fact, specifically mishandling money. It doesn't mean we don't take that seriously and we don't investigate it. The second chance, it's really not a second chance. It's a benefit of the doubt. The second chance is it's not in place. If the person is found to have violated it and it's clear, they're done. If it's not clear, then it's not done. And like I say, in this case, you've got the videotape, which clearly shows what happened in this situation. There's a legitimate reason. I've never seen the videotape, so maybe this is all hypothetical on my part, but we have a claim that is not so clear. Is that something we have to make a judgment about? I don't think you do, Your Honor. I think the court could, but I don't think the court has to look at that videotape to make that determination. I think when the employer looks at it and says, here's what we find on the videotape, here's the results of our investigation. And importantly, the plaintiff here has never denied that conduct. He's never once denied the conduct that the employer says is on the videotape. You've never once heard from him saying, I did not do that on August 25th. I did not engage in that conduct on August 27th. Never once has he said that. He had his opportunity to do so. He was in an interview. In your view, would his testimony, albeit arguably self-serving, would that have created a material issue of fact in the face of this evidence? I think at that point the court below could have looked at the videotape and made its own determination. And I disagree with the plaintiff as far as what the videotape shows. I think it's clear what the videotape shows. The videotape shows, as he rings into the POS system, actually there's a running POS right here like you would see on the screen. It shows what's rung up and what's not rung up. It shows him on one side of the bar serving customers and charging them for drinks. On the other side of the bar, and specifically the conduct engaged in, being very friendly with people, getting, I guess, a kiss that was more of a lick on the cheek and hugs from a girl, coming behind her. There was some evidence that at least one of the groups was a group that he knew. Is that correct? Yes. Is that clear that he knew this group? He stated in the interview that when he was interviewed by Human Resources that, yes, these were people he knew. In fact, he used to be a bartender at the Rio. And he believed that they had knew him from there. So there was at least one of these groups that he conceded in the interview, the investigative interview, that he did know these people. I don't want you to leave before we address the age discrimination. And, you know, in this day and age, so to speak, it is rare that we have direct evidence. That is not a typical case. What we have here is we have testimony from a former beverage manager that one of the vice presidents of food and beverage basically said, or made the suggestion that they would give a $400 bonus to any manager who could get terminated or weed out some of the older employees so that we could build them up with young, sexy employees. That is not a memo from which one needs to draw an inference. It's a fairly straightforward statement. Would you address why, even in the face of gross, which is a big hurdle now for age discrimination plaintiffs, why this doesn't at least raise some issue that should not be disposed of on summary judgment? Well, I think first of all, the evidence that that was made is not clear evidence. So, I mean, I don't want to agree. If the statement was made in taking the benefit of the facts in a light most favorable to the plaintiff, that is not appropriate to say. Well, but here it is. If you have, if one upper-level employee testifies that a food and beverage vice president made a statement, that wouldn't be hearsay, it would be an admission of a party, and so it would be admissible. Now, whether he might come in and deny it would be another thing. Certainly. But we have to take it not only is it admissible, but it says what it says for purposes of our proceeding. Do you agree with that? Yes. I agree that for purposes of this proceeding, you take that as if it were true. And given that, there's no evidence that the person who allegedly made the statement was involved as a decision-maker at all in this particular decision. But I think more importantly and beyond that is the but-for test. I mean, there is a legitimate basis. There's a legitimate basis in that this is a person who violated company policy, and it's clearly shown on videotape, and he's never denied the fact of what's shown on videotape. There is a legitimate basis to terminate Mr. Didiana. And so he can't get past the but-for test either. And I think that's the idea. Suppose there was evidence of somebody less than his age, somebody who was 35, caught in the same fashion who was not terminated. Is the fact that there is a cause and the question all by itself, and we don't have the evidence I'm hypothesizing, but suppose there is evidence that says you've got a 32-year-old, does the same thing, not terminated. If you had a 32-year-old bartender, male, engaged in the same conduct and shown on videotape and he hadn't been terminated, then that would be a different situation. And we would have a problem. So the inquiry doesn't necessarily end because there is a just cause for termination. If it turns out there's reasons to question the just cause, you can still get past that question. Now, in this case, there may not be such evidence, but I want to see where the line is drawn. And I agree with you, Your Honor, that in that case that would be a different situation, and we wouldn't, you know, the but-for wouldn't end the analysis. In this situation, I think the but-for ends the analysis because there is a plethora of evidence seduced below and nothing that shows anything of that nature. What about female employees? Because I don't think it would necessarily have to be a male employee since we're talking about age rather than gender under this part of the Civil Rights Act. Is there any evidence that any females under 40 were not terminated for similar behavior? No, Your Honor. I mean, other than what we've talked about with the cocktail waitresses and the difference between whether or not they're similarly situated individuals. But likewise, there's nothing to show that there were cocktail waitresses over the age of 40 that were terminated and ones under the age of 40 that were not terminated for similar conduct. My time is up. Thank you. Ms. Nelson, you have some rebuttal time. Thank you. Here's the problem. I heard probably 15 times my esteemed opposing counsel say the video evidence is clear, the video evidence is clear, over and over again. That is our major argument with respect to the lower court ruling. The lower court accepted the defendant's interpretation of what's on the video evidence. If the video evidence is not clear, and I presume the lower court looked at the video, because although it does not say so in the order, the lower court indicates there's clear video evidence of wrongdoing, and that evidence does not appear on video, that in and of itself creates an issue of fact. But this goes to Judge Clifton's, I think maybe even his opening question, which is if the employer has offered an explanation and the surveillance tape appears to be consistent with that, even if it's not sort of utterly conclusive in our minds, that is, that we can sort of independently verify and say, oh, absolutely, he's got his hand in the till and sticking it in his pocket, what deference do we have to give the employer, and what right do we have to second-guess the employer's decision about how they run their business, unless we've got something really obviously wrong? We do in this case. And if this were a case where we just had a videotape that showed or at least somewhat supported what the employer was saying and we didn't have any of the other age-based comments made by the employer, then I would not be standing in front of you, we would not have filed the appeal, and we would understand the lower court's ruling. But you can't separate the two causes of action in this case when you're talking about the videotape. The videotape in and of itself is suspect, because we have a scheme put in place by this employer offering bonuses and targeting older employees, and named our client specifically to get rid of him. Well, do you have the videotape for whatever it's worth? In other words, the employer thinks it shows one thing, so let's say they met their pretext burden. Why don't we have here an affidavit from your client that said, I didn't do this. You're just flat wrong. What is his testimony on that point? We actually have on the surveillance videotape when he's being interviewed, he's saying, I don't remember doing anything deliberately, but if I made a mistake, if I made a mistake, I could have made a mistake. So he not, when he's ---- I didn't do this, or any other evidence from him that basically says, because we have two occasions here, the 25th and the 27th. Do we have any affirmative evidence from him other than the interview on the videotape? Yes. We have a receipt that was actually provided by the company at the lower court level that supports our client's explanation with respect to the vodka shots. He said that he had voided out that particular transaction, and he had rerun the transaction. That receipt is found at the record at 252, and it specifically indicates in our client's handwriting on there that he rerun those shots. We also have his deposition testimony. During his deposition, he was being questioned by opposing counsel at the time, and she said, have you ever failed to ring up drinks? And he said, not to my knowledge. So all along, his testimony and the evidence has been consistent with him saying, look, I'm human, I could have made a mistake, but this was not delivered. I didn't do anything on purpose. See, that's where we come into a question, and that is even if he made a mistake, and he made multiple mistakes, if, in fact, he didn't ring up drinks, wouldn't the employer have, just forgetting age, sex, anything else, and whether it was a mistake or not, if someone didn't ring up drinks and didn't put in the money properly, wouldn't the employer have the ability to fire them? If we forget age discrimination and gender discrimination, absolutely. Absolutely. And I see that I have eight seconds left, so if you'd like me to address something, I'm happy to do it. I think that's all. Thank you. Thank you for your time.  and for coming here to the University of Arizona. The case of Didiana v. Carball Corporation is submitted.
judges: McKeown, Clifton, Bybee